# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 10, 2015        Decided February 23, 2016

No. 13-3073

UNITED STATES OF AMERICA,
APPELLEE

v.

SHAWN HUGHES,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00240-1)

———

*Gregory S. Smith*, appointed by the court, argued the cause and filed the briefs for appellant.

*Christopher R. Howland*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief was *Vincent H. Cohen Jr.*, Acting U.S. Attorney, and *Elizabeth Trosman* and *Oliver W. McDaniel*, Assistant U.S. Attorneys.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* BROWN.

WILLIAMS, *Senior Circuit Judge*: Shawn Hughes's managers at Blackhawk, Inc., a government contractor for security guard services, told her to certify that Blackhawk guards had received training that they had not in fact received, thereby enabling Blackhawk to charge more for each guard's services. Relying primarily on false training records from DB Training Services, Hughes complied. On October 29, 2009 she pleaded guilty to making false statements to government authorities, in violation of 18 U.S.C. § 1001(a)(2).

On December 20, 2011 the district court sentenced Hughes to 30 days in prison and 24 months of supervised release. More importantly, the court's sentencing judgment made Hughes and her co-defendant Douglas Brown, the owner of DB Training, jointly and severally liable for $442,330 in restitution. But, critically, the district court also expressed a clear intention that the actual restitution amount should be much smaller, perhaps as little as $0. A federal court had already entered judgment against Blackhawk, Inc. for more than $1 million. And the district court said, in sentencing Hughes, that she would not be on the hook at all if Blackhawk paid its fine. Even in the absence of such a payment, Hughes would only have to pay "at a rate of not less than $50 each month." Transcript of Sentence at 38-40. Hughes did not appeal, presumably in the entirely logical belief that the sentence required her to pay restitution of only $50 each month—if any.

Then her ordeal began.

In early 2013 Hughes found out that the Treasury Department had seized tax refunds due her amounting to $10,159. The Department had purported to act under the Treasury Offset Program ("TOP"), 31 U.S.C. §§ 3716 &

3720A, which authorizes the government, when it owes a person payment, to offset the amounts otherwise due with any "past-due, legally enforceable debt" to the government by withholding the payments. Because of her disqualification from work in security services (which reduced her income and largely explains her entitlement to a tax refund), Hughes was in precarious economic circumstances even before the tax seizure, with her home already on the verge of foreclosure.

On February 22, 2013 Hughes filed a Motion for Clarification or Modification of Supervised Release in the sentencing court, asking that the tax refunds be returned and future seizures stopped. Between April 23 and July 18, 2013, the court held four hearings on the matter. Simultaneously with the first hearing, the government filed a "Notice of Restitution Payments and Accounting," which indicated that Hughes had in effect contributed over $11,000 in restitution payments (including the TOP offset), and that Douglas Brown had paid $500. The Notice also indicated that not a cent had been received from Blackhawk, that the government's default judgment against it was exempt from bankruptcy discharge, and that the government "continue[d] to search for assets in satisfaction of this judgment." The Notice made no reference, however, to the assets in the Blackhawk bankruptcy estate, the status of the government's claims to those assets, government proceedings if any against principals or shareholders of Blackhawk, or any pursuit of Brown, DB Training or their assets.

At the first hearing, the court vacated Hughes's sentence, stating that it had not anticipated or intended that Hughes be subject to such a harsh sentence. Transcript of Motion Hearing, Apr. 23, 2013, at 13. At the second and third hearings, the court entertained further arguments about the resentencing. At the fourth hearing, the court reimposed its original sentence, saying that it had no authority to modify

Hughes's sentence. The court did not order the government to return Hughes's tax refunds or stop withholding future government payments otherwise due to Hughes.

The case poses two issues for us. First, should the district court have recognized and corrected a clerical error in its judgment? We hold that the sentence manifested such an error, which the district court should have corrected. Second, did the district court correctly refuse to order the return to Hughes of the funds seized by Treasury? In light of the necessary corrections in the sentence, we hold that the court's refusal to remedy the TOP collection was error, and we remand for the court to require the government to return Hughes's tax refunds and to cease withholding payments.

\* \* \*

Hughes argues, correctly, that the district court should have applied Rule 36 of the Federal Rules of Criminal Procedure, under which a "court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." In interpreting Rule 36, we have said that a court is bound by what it "plainly intended" and cannot modify a "sentence on the basis that it was unlawfully imposed." *United States v. Arrington*, 763 F.3d 17, 25 (D.C. Cir. 2014). Here there are clerical errors correctible under Rule 36 because the judgment did not reflect what was "plainly intended." First, the oral record says that "the balance of any restitution [is] owed at a rate of not less than $50 each month," and the written judgment has similar language. (The oral recitations control over the written ones, *United States v. Lewis*, 626 F.2d 940, 953 (D.C. Cir. 1980), but here there are no meaningful differences between the two.) That statement, however, must mean that a rate of not less *or more* than $50 each month was required. Otherwise, given the wide range

between $50 and $440,000, the judgment would be virtually meaningless. (Of course, the court can still adjust its payment schedule if the defendant's economic circumstances change. 18 U.S.C. § 3572(d)(3).) The intent to limit the payment to $50 a month is especially clear in light of the court's plain expression of intent that the Blackhawk fine could offset the entirety of Hughes's restitution.

Second, the district court said "that payment of restitution shall begin after the adjustment is figured where the fine for [Blackhawk] will be applied," and later added that Hughes was to pay "the balance of any restitution owed at a rate of not less than $50 each month . . . if it turns out that . . . there is an amount outstanding that [Hughes] owe[s]" after Blackhawk's fine is subtracted. Transcript of Sentence at 38-40. Although the wording may be inartful, the only reasonable meaning that can be assigned these words is that payment is due only after such time as Blackhawk's contribution should be determined. True, in the oral rendition of the sentence the court said at one point that the "restitution [is] immediately payable," but this boilerplate language is controlled by the specific and repeated references to payments beginning only after the Blackhawk payment has been subtracted. Transcript of Sentence, Dec. 20, 2011, at 38. A correction under Rule 36 removes the confusion, and we remand to the district court to make the correction.

We now turn to whether the district court erred in declining to order the government to return to Hughes the funds seized under the Tax Offset Program. The government argues that Hughes is barred by her alleged failure to exhaust administrative remedies, and that in any event any judicial remedy would require a separate civil suit (rather than simply continuing in the current proceedings). As to the alleged failure to exhaust, the government conspicuously fails to identify any administrative remedies available to Hughes after

Treasury began making deductions. Further, even assuming an available administrative remedy, § 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704, imposes no prerequisite of administrative exhaustion unless it is "expressly required by statute or agency rule." *Darby v. Cisneros*, 509 U.S. 137, 143 (1993). The government points to no statute or rule expressly imposing any such requirement.

That leaves the government's theory that Hughes's motion in criminal proceedings was inadequate for securing an order compelling return of funds seized under TOP or for halting any further seizures; such relief could come, it says, only in a new civil suit. Appellee's Br. 44 n.18. The APA generally provides a right of review, 5 U.S.C. § 702, and goes on to specify the form of the proceeding: absent some specific statutory requirement, which is lacking in this case, "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction," is an acceptable "form of proceeding for judicial review," *id*. § 703. It is undisputed that the district court is a "court of competent jurisdiction."

The only remaining question then for determining whether judicial review was appropriate here is whether Hughes's Motion for Clarification or Modification of Supervised Release as part of a criminal post-sentencing hearing is an "applicable form of legal action." At least under these circumstances, where agency action threatens to thwart the proper execution of the collection of restitution ordered by a district court criminal sentence, and where the Department of Justice's purported readings of the sentence have triggered the actions of Treasury (the overseer of TOP), see 31 U.S.C. § 3720A(a); U.S. Department of Justice, Notice of Intent to Offset, Jan. 31, 2012, it is hard to see why a motion in the sentencing court should not be an "applicable form of legal

action." Indeed, federal courts already have the authority to issue mandamus "in aid of their . . . jurisdictions," 28 U.S.C. § 1651(a), an authority that includes power "to issue such commands under [§ 1651] as may be necessary or appropriate to effectuate and prevent the frustration of orders [they have] previously issued," *United States v. New York Telephone Company*, 434 U.S. 159, 172 (1977). The power reaches even "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice" and "who have not taken any affirmative action to hinder justice." *Id*. at 174.

The government's thinly-supported assertion that "[d]efendants routinely bring civil actions of this nature," Appellee's Br. 44 n.18, is irrelevant, given the absence of any bar under the APA or elsewhere. The government itself has used motions in a sentencing court to seek judicial approval of wrapping a defendant's restitution obligations into TOP. *United States v. Beulke*, 892 F. Supp. 2d 1176, 1178, 1186-88 (D.S.D. 2012).

This takes us to the merits of Hughes's objection to the TOP offset. The statute applies to "a past-due, legally enforceable debt" from a person to a federal agency. 31 U.S.C. § 3720A(a). The key question then is whether Hughes's restitution obligation qualifies as such (or qualified at the time of the seizure). Treasury regulations (whose validity we assume arguendo) say that debt is "[d]elinquent or [equivalently] past-due . . . [when] a debt has not been paid by the date specified in the [creditor] agency's initial written demand for payment, or applicable agreement or instrument (including a post-delinquency payment agreement), unless other payment arrangements satisfactory to the creditor agency have been made." 31 C.F.R. § 285.5(b) (2009). As Hughes is obliged under the corrected sentence to start paying

money only when the Blackhawk fine is resolved, and, in any case, would only be delinquent if she paid less than $50 per month, we remand to the district court to direct the government to return Hughes's tax refunds and to stop its purported application of TOP so long as Hughes is not delinquent under Treasury regulations viewed in light of the corrected sentence.

*So ordered.*

BROWN, *concurring in part and concurring in the judgment*. I join the court's opinion to the extent it authorizes Rule 36 clarifications. I also agree the determination of when Ms. Hughes' debt became due may affect the validity of the Department of Justice's referral to the Treasury Offset Program. *See United States v. Martinez*, 2015 WL 9009626, at *1, *6 (10th Cir. 2015) ("[T]he statutory scheme directs the district court, not the government, to direct how and when the defendant is to satisfy a restitution order. . . . The government [can]not usurp the district court's role by enforcing payments not yet due under the court-ordered payment schedule.").

However, I do not join the Court's discussion of the viability of an APA challenge, in a criminal case, of the TOP program's alleged overreach. Too many questions remain about the interplay between TOP and several criminal restitution statutes, about whether Ms. Hughes received adequate notice, and about whether an administrative challenge to a TOP referral can be waived. These issues were not squarely presented nor were they sufficiently briefed to permit any confident assessment.

I am, nevertheless, completely in sympathy with the Court's bold response. This is a case in which the government behaved badly and—even when the unpalatable implications of their actions became evident—exhibited neither remorse nor gallantry. Politics is a form of violence; and, in democracies, the monopoly on force is accorded to the electoral victors. Bureaucratic institutions are justified by their efficiency. That efficiency is enhanced because they may invoke the threat of force to deter non-compliance. Even so, an expectation remains that the resort to force will be neither gratuitous nor grossly disproportionate.

Ms. Hughes committed a crime. She acknowledged her culpability and accepted responsibility. She was neither the instigator of the fraudulent scheme nor its main beneficiary.

That dubious distinction went to her corporate employer—Blackhawk.  Ms. Hughes, who had lost her main source of income and was on the verge of having her home foreclosed, nevertheless began making her $50 a month payments.   But DOJ wasted no time referring her alleged debt to the TOP program which immediately scooped up an $11,000 tax refund—about the only cash available to Ms. Hughes.  Paying off this $442,000 debt at $50 per month would take nearly 740 years; seizure of her tax refund may have reduced the reckoning by about 20 years.   If the referral stands, Ms. Hughes' future tax refunds and even her Social Security payments may also be seized by the government in satisfaction of her restitutionary debt.   The point is, no matter how much suffering the government inflicts on Ms. Hughes, the Department will never recover the full amount it is allegedly owed.  Yet there is no evidence the government ever sought to criminally prosecute Blackhawk—the most culpable party—a corporation that, so far as this record shows, has yet to pay a cent.   There is something very wrong with this picture—so wrong Stevie Wonder could see the flaw from a phone booth in Chicago.  The fact that the government cannot is deeply disturbing.